JMH:MS
F. #2023R00550

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR CELLULAR PHONES IN UNITED STATES SECRET SERVICE CUSTODY IN THE EASTERN DISTRICT OF NEW YORK | **APPLICATION FOR A SEARCH WARRANT FOR ELECTRONIC DEVICES**<br><br>Case No.   23-MJ-1005 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Hannah Dessert, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four cellular phones—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the United States Secret Service ("USSS") and have been since November 2019.  In that capacity, I have investigated numerous federal crimes, including the illegal trafficking, distribution and possession of counterfeit United States currency, as well as the unlawful distribution of controlled substances.  In the course of those investigations, I have conducted or participated in surveillance, debriefings of informants, and reviews of electronically stored information ("ESI").  Through that experience and my training

and education, I have become familiar with some of the ways in which both counterfeit currency and controlled substances are trafficked and distributed.  I have also participated in the execution of various search warrants, including for electronic evidence.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this investigation.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

4.     The property to be searched is (1) a black Samsung cellular phone with a black case seized from EDIHNO HUACCHA TOSCANO on or about October 27, 2023 (the "TOSCANO Phone"); (2) an Apple iPhone with a black case seized from CHRISTIAN GERMAN GARRIDO DAVALOS on or about October 27, 2023 (the "DAVALOS Phone"); (3) a Samsung cellular phone with a black case seized from RONALD GONZALES SOSA on or about October 27, 2023 (the "SOSA Phone 1") and (4) an Apple iPhone with a translucent case seized from RONALD GONZALES SOSA on or about October 27, 2023 (the "SOSA Phone 2") (collectively, the "Devices").  The Devices are currently located in United States Secret Service Custody in the Eastern District of New York and were lawfully seized by the Secret Service as described herein.

2

5.      Photographs of the front and back of the TOSCANO Phone are included below:



6.      Photographs of the front and back of the DAVALOS Phone are included below:



7.      Photographs of the front and back of the SOSA Phone 1 are included below:



8.      Photographs of the front and back of the SOSA Phone 2 are included below:



9.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

10.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 371, 471, 472, and 473 (forging,

possessing, and dealing in counterfeit currency and conspiracy), and Title 21, United States

Code, Sections 841 and 846 (distribution of controlled substances and conspiracy) (the

"SUBJECT OFFENSES") have been committed by EDIHNO HUACCHA TOSCANO,

RONALD GONZALES SOSA, CHRISTIAN GERMAN GARRIDO DAVALOS, and others.

There is also probable cause to believe that evidence, fruits, and instrumentalities of the

SUBJECT OFFENSES will be found in the Devices.

## **PROBABLE CAUSE**

11.     The United States Secret Service, the Drug Enforcement Administration,

and the New York City Police Department ("NYPD") have been investigating a counterfeit

currency and cocaine trafficking scheme operating in Queens, New York and elsewhere.  As part

of the investigation, an NYPD undercover officer (the "UC"), whose identity is known to me,

has made approximately 13 purchases of counterfeit United States currency or cocaine from

TOSCANO.  SOSA and DAVALOS participated in multiple of these transactions, including by

handling and/or delivering the counterfeit currency or cocaine before or after the sales.

12.     On October 27, 2023, officers arrested TOSCANO, SOSA, and

DAVALOS during one of these transactions.  On October 31, 2023, a grand jury sitting in the

Eastern District of New York returned an indictment charging TOSCANO, DAVALOS, and

SOSA with conspiracy to sell counterfeit currency, in violation of Title 18, United States Code,

Section 371, and conspiracy to distribute and possess with intent to distribute controlled

substances, in violation of Title 21, United States Code, Section 846.  A true and accurate copy

of the indictment is attached hereto as Exhibit 1.

13.     At the time of their arrests on October 27, 2023, TOSCANO, DAVALOS, and SOSA were each in possession of at least one cell phone, which officers seized. Specifically, from TOSCANO, officers seized the TOSCANO Phone; from DAVALOS, officers seized the DAVALOS Phone, and from SOSA, officers seized the SOSA Phone 1 and the SOSA Phone 2.

14.     There is probable cause to believe that these cell phones (the "Devices") contain evidence of the SUBJECT OFFENSES, for several reasons. As an initial matter, in advance of each undercover purchase, the UC would communicate with TOSCANO via cell phone to arrange the purchase. Typically, the UC would explain to TOSCANO the amount of counterfeit currency or cocaine he was seeking to purchase, and TOSCANO would inform the UC of the date and time of the transaction. Accordingly, there is probable cause to conclude that evidence of these communications, including records of calls with the UC, are located on the TOSCANO Phone.

15.     Further, in advance of some of the purchases, TOSCANO indicated that he first needed to obtain the cocaine or counterfeit currency from his "supplier." For example, for a purchase on July 19, 2023, the UC arranged with TOSCANO to purchase 60 grams of cocaine. When the UC arrived at the location of the transaction, he called TOSCANO, who asked the UC, in substance, to wait because his supplier was running a few minutes late but would be arriving shortly. A few minutes later, the UC observed a black Ford SUV (the "SOSA SUV," as set forth below) arrive at the location and park in front of the UC. Three men exited the SOSA SUV and entered a residence. A short time later, TOSCANO emerged from the residence and entered the UC's vehicle, where he sold the UC approximately 60 grams of a substance that later tested positive for cocaine.

6

16.     Motor vehicle records maintained by the state of New Jersey and available in a law enforcement database indicate that the registered owner of the SOSA SUV is SOSA. Records and information contained within the TOSCANO Phone, SOSA Phone 1, and/or SOSA Phone 2 are likely to show that the "supplier" TOSCANO was communicating with was in fact SOSA, and also help to identify the other men present at the transaction. In addition, location information contained within the SOSA Phone 1 and/or SOSA Phone 2 is likely to show that SOSA was one of the men who arrived in the SOSA SUV prior to the transaction.

17.     In addition, on or about September 5, 2023, the Honorable Edward S. Kiel, United States Magistrate Judge for the District of New Jersey, approved a search warrant, under Magistrate docket number 23-15226, authorizing the Government to place a GPS location tracking device on the SOSA SUV. GPS data obtained pursuant to that warrant showed the SOSA SUV regularly driving between New Jersey and the location where many of the undercover purchases took place. Location information contained within the SOSA Phone 1 and/or SOSA Phone 2 will likely show that it was SOSA who was driving the SOSA SUV during those trips.

18.     As another example, during a counterfeit currency transaction on September 5, 2023, the UC asked TOSCANO to trade out one of the counterfeit bills he was purchasing from TOSCANO. TOSCANO agreed and walked to the back of the SOSA SUV, which was parked nearby. Inside the trunk of the SOSA SUV were several suitcases, one of which TOSCANO opened, revealing counterfeit currency. The UC handed a counterfeit $100 bill to TOSCANO in exchange for a different counterfeit $100 bill from one of the suitcases. The UC also observed a separate envelope containing counterfeit currency, which TOSCANO informed the UC was for another buyer. Footage from a pole camera placed at the location

7

showed that, shortly thereafter, an individual who appeared to be consistent with SOSA's appearance was seated in the driver's seat of the SOSA SUV.  Agents observed the individual exit the driver's seat of the vehicle and open the trunk.  Agents then observed an individual who appeared to be consistent with DAVALOS's appearance, along with an unknown individual, unloading the suitcases from the SOSA SUV and bring them into a residence.  Records of communications from all four of the Devices are likely to show coordination among TOSCANO, SOSA, and DAVALOS regarding the sale of counterfeit currency that day, and also help to identify the other individual who unloaded counterfeit currency from the SOSA SUV.  Likewise, location information from the DAVALOS Phone, SOSA Phone 1 and/or SOSA Phone 2 is likely to show that SOSA and DAVALOS were in fact present for the transaction, and that they are the individuals observed on the pole camera.

19.     As a final example, on October 26, 2023, the UC spoke by phone with TOSCANO and arranged to purchase 500 grams of cocaine on the evening of October 27, 2023. The next day, the UC again spoke by phone with TOSCANO, who stated, in substance and in part, that the cocaine sale would have to occur later that night because he was waiting to receive the narcotics from his supplier, who had to drive from New Jersey.  Records and information from the TOSCANO Phone, SOSA Phone 1 and/or SOSA Phone 2 are likely to reflect communications between TOSCANO and SOSA about the timing of the transaction that evening.

20.     Shortly after TOSCANO informed the UC about the delay from his supplier, agents observed through a pole camera that had been placed outside a residence in New Jersey multiple individuals loading bags into a gold Toyota minivan (the "SOSA Minivan," as set forth below), which then drove away.  Using license plate reader data, agents tracked the

SOSA Minivan as it drove to Queens, New York.  Like the SOSA SUV, motor vehicle records maintained by the state of New Jersey and available in a law enforcement database indicate that the registered owner of the SOSA Minivan is SOSA.

21.     The UC met TOSCANO that evening, who entered the UC's vehicle and instructed the UC to drive to a laundromat in Queens.  Once they arrived at the laundromat, they picked up DAVALOS.  Thereafter, the UC, TOSCANO, and DAVALOS parked in another location in Queens, where the SOSA minivan also parked.  DAVALOS exited the UC's vehicle, walked to the back of the SOSA SUV, opened the trunk, and removed a small item.  DAVALOS walked back to the UC's vehicle and reentered it.  Inside, DAVALOS handed the UC a small plastic container.  Inside the container was a black bag, inside of which was approximately 500 grams of a white powdery substance that resembled cocaine.  At that point, agents arrived at the UC's vehicle and placed TOSCANO and DAVALOS under arrest.   Around the same time, agents approached the gold SOSA Minivan and identified SOSA as the driver of the vehicle.  Records and information on all four Devices are likely to show coordination among DAVALOS, SOSA, and TOSCANO that day, including with respect to the timing of SOSA's arrival, the location of DAVALOS, and details of the transaction.[1]

22.     Based on my training and experience, I know that individuals who conspire to sell counterfeit currency and narcotics frequently communicate with one another

---

[1] On October 26, 2023, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, issued a warrant to search a nearby residence, under Magistrate Docket Number 23-946, and seize evidence of, among other things, narcotics and currency trafficking.  Immediately following the arrests of TOSCANO and DAVALOS in the evening on October 27, 2023, agents executed the search warrant.  Inside the residence, agents found, among other evidence, an envelope containing multiple counterfeit $100 bills.

using electronic devices, including through phone calls, text messages, e-mail, and instant messaging applications.  I further know that individuals who conspire to sell counterfeit currency and narcotics frequently plan and execute their crimes, including arranging purchases from suppliers and sales to customers, using electronic devices, and that information about those purchases and sales, including communications and location information, is often stored on the electronic devices.

23.     Indeed, here, as explained above, the UC communicated with TOSCANO by cell phone for months.  In addition, on multiple occasions, DAVALOS and SOSA played key roles in the sales of narcotics to the UC, including after TOSCANO referenced communications with his "supplier."  Communications and location information from the Devices will likely confirm the roles played by DAVALOS and SOSA and help to identify additional members of the conspiracy.  Contacts lists on the phones will likely show that TOSCANO, DAVALOS, and SOSA are associated with each other, and similarly help to identify other co-conspirators.  And any pictures of counterfeit currency or narcotics on the Devices will provide additional evidence of unlawful possession and/or distribution.

24.     The Devices are currently in the lawful possession of the United States Secret Service in the Eastern District of New York, having been seized as described above.  In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the government.

**TECHNICAL TERMS**

25.     Based on my training and experience, I use the following technical terms to convey the following meanings:

10

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.

11

This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP

13

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.  Based on my training, experience, and research I know that the Devices each have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

14

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15

29.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

30.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

*Hannah Dessert*

Hannah Dessert
Special Agent
United States Secret Service

Subscribed and sworn to before me by telephone
on November 9, 2023:

Hon. Ramon E. Reyes, Jr.   Digitally signed by Hon. Ramon E. Reyes, Jr.
Date: 2023.11.09 18:32:08 -05'00'

HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

17

### ATTACHMENT A

The property to be searched is (1) a black Samsung cellular phone with a black case seized from EDIHNO HUACCHA TOSCANO on or about October 27, 2023 (the "TOSCANO Phone"); (2) an Apple iPhone with a black case seized from CHRISTIAN GERMAN GARRIDO DAVALOS on or about October 27, 2023 (the "DAVALOS Phone"); (3) a Samsung cellular phone with a black case seized from RONALD GONZALES SOSA on or about October 27, 2023 (the "SOSA Phone 1") and (4) an Apple iPhone with a translucent case seized from RONALD GONZALES SOSA on or about October 27, 2023 (the "SOSA Phone 2") (collectively, the "Devices").  The Devices are currently located in United States Secret Service Custody in the Eastern District of New York and were lawfully seized by the Secret Service as described herein.

Photographs of the front and back of the TOSCANO Phone are included below:



Photographs of the front and back of the DAVALOS Phone are included below:



Photographs of the front and back of the SOSA Phone 1 are included below:



Photographs of the front and back of the SOSA Phone 2 are included below:



This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of

Title 18, United States Code, Sections 371, 471, 472, and 473 (forging, possessing, and dealing

in counterfeit currency and conspiracy), and Title 21, United States Code, Sections 841 and 846

(distribution of controlled substances and conspiracy) (the "SUBJECT OFFENSES") involving

EDIHNO HUACCHA TOSCANO, RONALD GONZALES SOSA, CHRISTIAN GERMAN

GARRIDO DAVALOS, and others since January 1, 2023, including:

     a.   communications among TOSCANO, SOSA, DAVALOS and co-conspirators, including logs, text messages, photographs, videos sent through any and all mobile applications, including email, SMS, iMessage, WhatsApp, and similar encrypted and unencrypted applications, and emails regarding the planning and/or execution of the SUBJECT OFFENSES;

     b.   lists of customers and related identifying information;

     c.   photographs and/or videos of narcotics or counterfeit currency, or the preparation or handling of narcotics or counterfeit currency;

     d.   types, amounts, and prices of drugs and counterfeit currency trafficked as well as dates, places, and amounts of specific transactions;

     e.   information related to sources of drugs or counterfeit currency (including names, addresses, phone numbers, or any other identifying information);

     f.   information related to the identities of co-conspirators (including names, addresses, phone numbers, or any other identifying information);

g.  information reflecting TOSCANO's, SOSA's, or DAVALOS's schedule, travel, or location, to include mapping information for driving directions;

h.  records and information relating to location information for the Devices;

i.  any information related to vehicles connected to narcotics and counterfeit currency transactions;

j.  all bank records, checks, credit card bills, account information, and other financial records.

k.  search history, including any searches related to the locations of the narcotics and counterfeit currency transactions;

l.  information and records which assist in placing the above-described evidence in context.

2.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# EXHIBIT 1

JMH:MS
F. #2023R00550

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
*   OCTOBER 31, 2023   *
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

EDIHNO HUACCHA TOSCANO,
RONALD GONZALES SOSA and
CHRISTIAN GERMAN
GARRIDO DAVALOS,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. __23-CR-434__
(T. 18, U.S.C., §§ 371, 492, 982(a)(2)(B)
and 3551 et seq.; T. 21, U.S.C.,
§§ 841(b)(1)(C), 846, 853(a) and 853(p);
T. 28, U.S.C., § 2461(c))

Judge  William F. Kuntz, II
Magistrate Judge Robert M. Levy

THE GRAND JURY CHARGES:

COUNT ONE
(Conspiracy to Sell Counterfeit Currency)

1.     In or about and between May 2023 and October 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EDIHNO HUACCHA TOSCANO, RONALD GONZALES SOSA and CHRISTIAN GERMAN GARRIDO DAVALOS, together with others, did knowingly and willfully conspire to sell, exchange, transfer and deliver counterfeited obligations of the United States, to wit: counterfeited United States currency, with the intent that the same be passed, published and used as true and genuine, contrary to Title 18, United States Code, Section 473.

2.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants EDIHNO HUACCHA TOSCANO, RONALD GONZALES SOSA and CHRISTIAN GERMAN GARRIDO DAVALOS, together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a)     On or about May 23, 2023, within the Eastern District of New York, the defendant EDIHNO HUACCHA TOSCANO sold approximately $10,000 of counterfeit United States currency to an undercover law enforcement officer (the "UC").

(b)     On or about May 31, 2023, within the Eastern District of New York, the defendant EDIHNO HUACCHA TOSCANO sold approximately $13,100 of counterfeit United States currency to the UC.

(c)     On or about August 3, 2023, within the Eastern District of New York, the defendant EDIHNO HUACCHA TOSCANO sold approximately $10,000 of counterfeit United States currency to the UC.

(d)     On or about September 5, 2023, within the Eastern District of New York and elsewhere, the defendant RONALD GONZALES SOSA drove a vehicle containing counterfeit United States currency from New Jersey to a residence in Queens, New York (the "Residence"), the location of which is known to the Grand Jury.

(e)     On or about September 5, 2023, within the Eastern District of New York, the defendant CHRISTIAN GERMAN GARRIDO DAVALOS unloaded counterfeit United States currency from a vehicle and carried it into the Residence.

(f)     On or about September 5, 2023, within the Eastern District of New York, the defendant EDIHNO HUACCHA TOSCANO sold approximately $9,900 of counterfeit United States currency to the UC.

       (g)     On or about October 27, 2023, within the Eastern District of New York, the defendant RONALD GONZALES SOSA drove a vehicle containing counterfeit United States currency to a location near 88th Street in Queens, New York.

      (Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances)

       3.     In or about and between May 2023 and October 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EDIHNO HUACCHA TOSCANO, RONALD GONZALES SOSA and CHRISTIAN GERMAN GARRIDO DAVALOS, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

      (Title 21, United States Code, Sections 846 and 841(b)(1)(C); Title 18, United States Code, Sections 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT ONE

       4.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 982(a)(2)(B), which requires any person convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense; and (b) Title 18, United States Code, Section 492 and Title 28, United States Code, Section 2461(c), which require the forfeiture of all counterfeits of any coins or obligations or other securities of the United States or of any foreign

government, or any articles, devices and other things made, possessed or used in violation of

Title 18, United States Code, Chapter 25, or any material or apparatus used or fitted or intended

to be used in the making of such counterfeits, articles, devices or things, including but not

limited to approximately $45,000 in counterfeited United States currency seized in Queens, New

York on or about May 23, 2023, May 31, 2023, August 3, 2023, September 5, 2023 and October

27, 2023.

     5.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendant up to the value of the forfeitable

property described in this forfeiture allegation.

     (Title 18, United States Code, Sections 492 and 982(a)(2)(B); Title 21, United

States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT TWO

     6.    The United States hereby gives notice to the defendants that, upon their

conviction of the offense charged in Count Two, the government will seek forfeiture in

accordance with Title 21, United States Code, Section 853(a), which requires any person

5

convicted of such offense to forfeit: (a) any property constituting, or derived from, any proceeds obtained directly or indirectly as the result of such offense; and (b) any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense.

       7.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

          (a)     cannot be located upon the exercise of due diligence;

          (b)     has been transferred or sold to, or deposited with, a third party;

          (c)     has been placed beyond the jurisdiction of the court;

          (d)     has been substantially diminished in value; or

          (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

     (Title 21, United States Code, Sections 853(a) and 853(p))

               A TRUE BILL

               *Mary Beth Glickman*
               FOREPERSON

*By Carolyn Pokorny, Assistant U.S. Attorney*
_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

Case 1:23-cr-00434-WFK   Document 11   Filed 10/31/23   Page 6 of 6 PageID #: 31

F. #2023R00550
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

EDIHNO HUACCHA TOSCANO, RONALD GONZALES SOSA,
and CHRISTIAN GERMAN GARRIDO DAVALOS

Defendants.

## INDICTMENT

(T. 18, U.S.C., §§ 371, 492, 982(a)(2)(B) and 3551 et seq.; T. 21, U.S.C.,
§§ 841(b)(1)(C), 846, 853(a) and 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                              *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                              *Clerk*

*Bail, $* _____

_____

*Matthew Skurnik, Assistant U.S. Attorney (718) 254-6231*